[Cite as *Harborside of Dayton Ltd. Partnership v. Safety Natl. Cas. Corp.*, 2023-Ohio-4562.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| HARBORSIDE OF DAYTON LIMITED PARTNERSHIP et al. | : | |
| | : | |
| | : | C.A. No. 29621 |
| Appellants | : | |
| | : | Trial Court Case No. 2019 CV 05584 |
| v. | : | |
| | : | (Civil Appeal from Common Pleas |
| SAFETY NATIONAL CASUALTY CORPORATION et al. | : | Court) |
| | : | |
| | : | |
| Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 15, 2023

. . . . . . . . . . .

QUINTIN F. LINDSMITH, JENNIFER G. COOPER & ANDREW ROACH, Attorneys for Appellee

MARK J. KESSLER, LAWRENCE BLUESTONE, & LAUREN GERSHUNY, Attorneys for Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Plaintiffs-Appellants Harborside of Dayton Limited Partnership ("Harborside"), Sun Healthcare Group, Inc. ("Sun"), and Genesis Healthcare LLC ("Genesis") (collectively, "the Plaintiffs") appeal from an order of the Montgomery County

Common Pleas Court granting summary judgment to Defendant-Appellee Broadspire Services, Inc. ("BSI"). For the following reasons, we will affirm the judgment of the trial court.

I. Facts and Course of Proceedings

{¶ 2} This appeal involves the handling of a worker's compensation claim by self-insured employers, their third-party administrators, and their excess insurance carrier. In 2006, Harborside operated a long-term care facility in Dayton known as Forest View Care and Rehabilitation Center. A.C.W. was hired by Harborside as a director of nursing.[1] On August 8, 2006, A.C.W. was injured when she tripped and fell at Harborside's facility while in the scope of her employment. A.C.W. filed a workers' compensation claim and was granted temporary disability benefits.

{¶ 3} At the time A.C.W. was injured, Harborside had a contract with Corvel, a third-party administrator, to assist it with handling its workers' compensation claims. As a self-insured employer, Harborside had procured an excess insurance policy with Safety National Casualty Corporation ("Safety National"), which was in effect for the period during which A.C.W. was injured. The insurance policy provided that Safety National would be obligated to pay for the costs of a workers' compensation claim that exceeded Harborside's self-insured retention ("SIR") amount of $500,000 and Harborside would be responsible for paying any costs up to $500,000. Further, Harborside was required to provide prompt notice of a claim to Safety National when the claim had exceeded or was

_____

[1] To protect the privacy of the injured employee, we will use initials rather than her name.

likely to exceed 50% of the SIR (i.e., $250,000) or when the injured employee's disability exceeded one year in duration or appeared reasonably likely to exceed one year in duration.

**{¶ 4}** In October 2006, Sun acquired Harborside. At that time, Sun was insured under an excess policy issued by a subsidiary of AIG for the policy term of April 1, 1998 through December 31, 2009. The SIR amount under the AIG policy was $1,000,000. Therefore, under the AIG policy, Sun would be responsible for paying the first $1,000,000 on any claim covered by the excess policy, and AIG would take over financial responsibility for any amounts exceeding that threshold.

**{¶ 5}** The cost of A.C.W.'s claim increased over time as A.C.W.'s condition worsened. For example, A.C.W. was granted an allowable condition of a lumbar strain with sciatica on December 15, 2006, was granted temporary total benefits effective March 6, 2007, and underwent a neurosurgery evaluation in February 2009. As of February 2009, the total amount paid on A.C.W.'s claim was $126,523, and there was the possibility that future spinal surgery would be necessary.

**{¶ 6}** Corvel initially provided information to Safety National about the A.C.W. claim and its increasing costs. But Safety National typically did not set up its own claim file until the costs of the claim reached at least one-half the SIR amount under the excess policy. On June 1, 2009, BSI took over for Corvel as the third-party administrator for Sun's workers' compensation claims, including A.C.W.'s claim. Angela Love, an employee of Safety National during the relevant period, stated that Safety National received the last loss-run report from Corvel in March 2009 but did not reach out to Corvel

again for further information on the A.C.W. claim until September 2011. At that time, Safety National first became aware of the change in Sun's third-party administrators from Corvel to BSI. According to Janice Burnap, the Director of Risk and Insurance Services for Sun (and later, Genesis), it was Sun's responsibility to notify Safety National about any change in Sun's third-party administrator.

{¶ 7} The amount of A.C.W.'s claim continued to grow, and attempts to settle the claim proved unsuccessful. By October 2010, the A.C.W. claim exceeded 50% of the $500,000 SIR under the Safety National excess insurance policy. Just a year later, on October 6, 2011, the incurred amount on the A.C.W. claim exceeded $500,000.

{¶ 8} On February 17, 2012, Maggie Smith, Senior Claims Analyst for Safety National, sent a letter to BSI asking it to complete and return an attached first report form relating to A.C.W. The letter noted that "[a] review of the most recent 2012 workers' compensation loss experience report" for the A.C.W. claim showed that the claim needed to be reported to Safety National, because the total incurred "exceeded 50% of the Self-Insured Retention Level." According to the letter, "the total incurred shown is $521,177 the S.I.R. is $500,000." On April 2, 2012, Linda Mullans, an employee of Safety National, sent an email to Vicky Hardie at BSI requesting the first report update. Hardie emailed the first report and supporting documentation to Linda Mullans on April 6, 2012.

{¶ 9} Maggie Smith, on behalf of Safety National, then authored an August 30, 2012 Reservation of Rights ("ROR") letter addressed to Hardie at BSI. In the letter, Smith acknowledged receipt of the initial report relating to the A.C.W. claim. Smith then referred to the language in the excess insurance policy. Smith explained, in part:

The file should have been reported to us previously based on the fact the lost time exceeded one year and the total incurred exceeded 50% of the self insured retention. The late report is in violation of Section I of the Insurance Agreement.

Failure to report the claim to Safety National on a timely basis also denied us the opportunity to participate in the defense of this claim, which is provided under Section J of the Insurance Agreement.

The claimant underwent surgery in November of 2010. Per the information received it appears her surgery was not litigated. * * * This is a potential violation of Section K of the Insurance Agreement.

* * * Failure to reasonable [sic] attempt to settle this claim is another potential violation of Section K of the Insurance Agreement.

Lastly, Section U states, in part, that full compliance by the Employer with all terms of this agreement is a condition precedent to the Corporation's liability hereunder. As noted above there are violations to this agreement, which in turn would be a violation of this section of the agreement.

{¶ 10} Smith then concluded her letter with the following reservation of rights language:

Safety National is accepting notice of this loss subject to a full Reservation of Rights under the Insurance Agreement. We will need additional information from you in order to determine whether we will provide coverage for this claim, but there shall be no waiver of our rights by

our continued investigation. We also acknowledge that the Harborside Healthcare Corporation does not waive any of its rights under the Agreement. We also wish to reserve our right to amend this reservation based on new information revealed during the course of our investigation. In regard to our investigation, please provide us with a complete copy of your file, file notes, and anything else you believe is pertinent to the coverage issues cited in this letter that may not have already been sent. Upon receipt and review of all file materials, we will contact you regarding our position concerning coverage of this claim.

{¶ 11} Despite Safety National's communications to BSI identifying itself as the excess carrier for the A.C.W. claim, Kelly Dickens, the sole employee in BSI's Excess Reimbursement Department, ultimately identified AIG as the excess insurer that was responsible for covering the A.C.W. claim. In a February 8, 2012 email, Vicky Hardie asked Dickens whether she had any contact information for the excess insurer. Hardie stated that the claim needed to be reported and the carrier was a subsidiary of AIG. Later that day, Dickens sent a response email to Hardie and carbon copied Janice Burnap, an employee of Sun, on the email. Dickens stated "Hi Vicky, I do not show that this claim has any excess coverage. I could not find coverage for this * * * claim out of the State of Ohio. The below policy only shows coverage for claims in the state of Washington. Please see the below print screens." The email then contained screen shots presumably from BSI's claims system. Dickens then concluded the email by stating: "Again I only show coverage for the state of WA, not Ohio. And this claim does not have any location

codes tied to the excess policy. Therefore there is no excess I can offer. I am carbon copying Janice Burnap, just in case she may have any conflicting information." On October 8, 2012, Dickens sent another email to Hardie and carbon copied Burnap. She stated, in part: "As stated previously, I do not show this claim has any excess coverage. I had carbon copied the client [Burnap] and there was no dispute to the information that I presented. I will carbon copy again for extra measure." Burnap did not respond to either of these two emails, despite being copied on both.

{¶ 12} On November 8, 2012, Dickens sent an email to Shannon Etter, an employee of BSI, related to the excess insurance coverage for the A.C.W. claim. Dickens also copied three employees of BSI and Burnap on this email. Dickens stated, "Hi Shannon, I had incorrectly advised Vicky that I could find no excess coverage for these claims. After checking again, I did locate. For [the A.C.W. claim], please see the excess coverage below." Dickens then listed an AIG policy that had an SIR of $1,000,000. She also provided Etter with the contact information for the insurer so that notice of the claim could be sent to AIG. Burnap again did not reply to the November 8, 2012 email despite being copied. Sun merged with Genesis shortly thereafter. Burnap was retained as an employee by Genesis after the merger.

{¶ 13} As the cost of the A.C.W. claim continued to grow, there remained confusion internally at BSI regarding which excess insurer was responsible for the A.C.W. claim. Dickens believed AIG was the correct excess insurer in spite of the fact that Safety National had stated the claim was covered by a Safety National excess insurance policy and sent an ROR letter to BSI regarding the A.C.W. claim. Due to BSI's belief that AIG

was the correct insurer, BSI provided only minimal information about the A.C.W. claim to Safety National over the next several years and apparently did not immediately respond to the ROR letter or forward the letter to its client, Sun (or later, Genesis).

{¶ 14} On June 18, 2015, Maggie Smith of Safety National sent an email to Hardie at BSI attaching the August 2012 ROR letter. In the email, Smith stated, in part: "Per our conversation, attached is the Reservation of Rights that we issued in August 2012. Should you have any questions, please contact me." In a September 21, 2015 email to Hardie, Smith stated "I am following up on our Reservation of Rights letter that we sent on May 23, 2012. Per our telephone conversation on June 18, 2015 you advised that AIG was the excess carrier however we also have a policy that covers the date of the injury. I am trying to obtain an update regarding this file. Can you please provide the same for our review?" On January 14, 2016, Smith again emailed Hardie, stating "I am following up on my email of 9/21/15. Can you please respond?"

{¶ 15} AIG's actions during this time added to the confusion. AIG, presumably based on its excess insurance policy with Sun that covered Sun's claims at the time A.C.W. was injured, initially acted as if it would accept financial responsibility for the A.C.W. claim once it hit the $1,000,000 SIR amount. But as time wore on and the claim moved closer to that threshold, it started to become clear that AIG was not going to accept financial responsibility for the A.C.W. claim.

{¶ 16} In August and September 2018, there were several emails sent to and from Denis Cassidy, the Workers' Compensation Manager at Genesis. He reached out to Burnap for assistance in determining whether AIG or Safety National was responsible for

paying the excess amounts on the A.C.W. claim. On August 27, 2018, Burnap sent an email to Cassidy to let him know that she had reviewed "Harborside Summaries of Insurance," which made it clear that the Safety National policy applied to the A.C.W. claim. Further, she stated that there "is no way [AIG's] coverage would have applied." Several of the Plaintiffs' current and former employees later testified that Burnap would have been the best person to contact at Sun, and later Genesis, to determine which company was the correct excess insurer for the A.C.W. claim. Further, in her November 30, 2021 deposition, Burnap testified that if anyone from BSI had directly contacted her for that information back in 2012, she would have stated that Safety National was the correct excess insurance carrier for the A.C.W. claim. When asked at her deposition about Kelly Dickens' emails in the 2012 timeframe relating to which company was the proper excess insurance carrier, Burnap explained that she would not have responded to such emails because she was only carbon copied on them rather than being the person to whom the emails were directly addressed.

{¶ 17} Ultimately, on April 9, 2018, BSI submitted an excess reimbursement request to Safety National on behalf of Genesis relating to the A.C.W. claim. At that time, the amount of the request was $803,073.49. On April 30, 2019, Smith sent a letter to Hardie at BSI stating that Safety National was "exercising our rights reserved in our letter to you dated August 30, 2012 to deny this claim for coverage" under the policy. Smith pointed out that Harborside had failed "to comply with a number of conditions precedent set forth in the Policy." The letter explained, in part:

Despite repeated requests for information regarding this employee

thereafter, we never received any response from you until June 2015 when in a telephone conversation, we were advised this matter was being reported to AIG. Thereafter, we again repeatedly requested information about this claim, to no avail. On or about April 9, 2018, we received a Request for Reimbursement in the amount of $803,073.49. Subsequently, we were provided with some documentation from you which included file notes and some Industrial Commission and court filings relating to [the A.C.W.] claim. From our review of the information submitted to us, it is clear that Harborside has breached a number of material conditions in the Policy such that we must deny this claim[.]

**{¶ 18}** Smith explained that the prompt notice requirements of Section I of the policy between Harborside and Safety National had not been satisfied. Although the claim had exceeded 50% of the self-insured retention by October 2010, no notice of the claim was reported at that time in violation of Section I(a). Further, Smith stated that the failure to report the claim until more than five years after the injury violated Section I(c), which required prompt notice to Safety National of any disability claim where it appeared reasonably likely that the disability would exceed one year in duration. Smith reiterated much of what was stated in the 2012 ROR letter. Smith also noted that the failure to settle the matter within the SIR amount, the failure to inform Safety National of the settlement consideration, and the decision to break off settlement discussions with the employee and her counsel violated Sections J and K of the policy.

**{¶ 19}** Smith concluded the April 30, 2019 denial letter as follows:

Based upon the foregoing, and as described in the Reservation of Rights letter, [Safety National] is under no duty to provide coverage to Harborside Healthcare under the Policy. However, without prejudice to its rights to deny coverage for the [A.C.W.] claims (and without waiving our right to raise additional grounds to deny coverage which may be discovered on further investigation), we are amicable to possible compromise of this matter.

{¶ 20} In her October 14, 2021 deposition, Smith testified that the late reporting of the A.C.W. claim was what triggered Safety National's decision to issue an ROR letter. Further, based on when Safety National received the first report from BSI, she likely would have recommended a denial of the Plaintiffs' excess claim even if Plaintiffs and BSI had followed up promptly with the requested information. Olie Jolstad, the expert hired by BSI, and Nancy Cavey, the expert hired by Safety National, both agreed with Smith that it was clear the claim was going to be denied once the ROR letter was sent in 2012.

{¶ 21} On November 25, 2019, the Plaintiffs commenced an action in the Montgomery County Court of Common Pleas against Safety National and BSI, alleging that Safety National had breached its insurance contract and its duty of good faith and fair dealing with Harborside and that BSI had breached its services contract with Sun, breached its contract with third-party beneficiaries Harborside and Genesis, and committed negligence with respect to Sun, Harborside, and Genesis. Safety National and BSI filed answers to the complaint.

{¶ 22} Several depositions were taken by the parties and expert reports were

exchanged. On July 19, 2022, BSI filed a motion for summary judgment seeking the dismissal of all the Plaintiffs' claims. On that same day, the Plaintiffs filed their own motion for summary judgment. On August 10, 2022, the Plaintiffs filed a notice of dismissal with prejudice of all claims by and between them and Safety National.

{¶ 23} On September 21, 2022, the trial court granted BSI's motion for summary judgment and overruled the Plaintiffs' motion for summary judgment. The Plaintiffs filed a timely appeal.

{¶ 24} All four of the Plaintiffs' assignments of error relate to the trial court's decision to grant summary judgment to BSI. Appellate review of a trial court's ruling on a summary judgment motion is de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012-CA-18, 2013-Ohio-2767, ¶ 42. De novo review " 'means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law genuine issues exist for trial.' " *Riverside v. State*, 2016-Ohio-2881, 64 N.E.3d 504, ¶ 21 (2d Dist.), quoting *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997). On such review, we do not grant deference to the trial court's determinations. *Powell v. Rion*, 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6 (2d Dist.).

{¶ 25} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving

party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Id.* at 292-293.

{¶ 26} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings. *Id.* at 293. Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 27} The trial court applied Georgia law when ruling on the substantive claims brought by the Plaintiffs, because the contracts between the Plaintiffs and BSI provided that Georgia law would apply. We also will look to Georgia law when reviewing the trial court's finding that the Plaintiffs' claims failed as a matter of law.

II.    The Plaintiffs Did Not File Their Lawsuit Within One Year of When Their Claims Accrued Under Georgia Law

{¶ 28} The Plaintiffs' first assignment of error states:

THE TRIAL COURT ERRED IN FINDING THAT APPELLANTS' CLAIMS "ACCRUED" AS A MATTER OF GEORGIA LAW IN 2018, BECAUSE APPELLANTS COULD NOT HAVE SUCCESSFULLY

MAINTAINED AN ACTION AGAINST BROADSPIRE UNTIL 2019, WHEN SAFETY NATIONAL CASUALTY CORPORATION ("SNCC") DENIED COVERAGE FOR THE ACW CLAIM.

**{¶ 29}** The service contracts between the Plaintiffs and BSI provided that any action by the Plaintiffs against BSI arising out of the contract between them "must be commenced within one (1) year from the date on which any right, claim, demand or cause of action shall first accrue." The trial court noted that "Georgia law is well settled that a cause of action for breach of contract begins to accrue at the time of the alleged breach, not the time the damage results or is discovered." Summary Judgment Decision (Sep. 21, 2022), p. 12-13, citing *Hamburger v. PFM Capital Mgt., Inc.*, 286 Ga.App. 382, 385, 649 S.E.2d 779 (2007), and *Mobley v. Murray Cty.*, 178 Ga. 388, 397-398, 173 S.E. 680 (1934). The trial court then pointed out that the Plaintiffs had alleged that BSI breached the Agreement as early as 2010, when the A.C.W. claim amount reached 50% of the SIR, and as late as December 19, 2016, when BSI failed to update the claim file or inform the Plaintiffs of inquiries by Safety National. The trial court concluded that the alleged "breaches occurred well before November 25, 2018. Therefore, these claims for breach of contract, negligence, and breach of the duty of good faith and fair dealing are in fact barred by the contractual period of limitations set forth in the Agreements." Summary Judgment Decision, p. 13.

**{¶ 30}** The Plaintiffs contend that the trial court erred when it found that their claims had accrued when BSI breached the service contracts. According to the Plaintiffs, their claims did not accrue until the date upon which they could have successfully maintained

their action, which was April 30, 2019, the date on which Safety National sent its denial letter.   Since the Plaintiffs filed their action only seven months after receiving the denial letter, "the trial court's statute of limitations decision was error and should be reversed." Appellants' Brief, p. 18.

{¶ 31} BSI responds that the record establishes that the Plaintiffs' "claim accrued at the latest when [Safety National] refused to reimburse them for the Claim based on the RoR letter and Appellants knew they could not provide any information to alter [Safety National's] position.   A letter reiterating a previously-stated basis for denial of coverage is unnecessary for the claim to accrue."   Appellee's Brief, p. 16.

{¶ 32} Under Ga. Code Ann. § 9-3-24, an action for breach of a written contract must be brought within six years of the breach.   *Godwin v. Mizpah Farms, LLLP*, 330 Ga.App. 31, 38, 766 S.E.2d 497 (2014), citing *Hamburger,* 286 Ga.App. at 384, 649 S.E.2d 779.   However, "it is well settled that limitation clauses reducing the time permitted to assert claims from six years to one year are enforceable."   *Carrier Corp. v. Rollins, Inc.*, 316 Ga.App. 630, 632, 730 S.E.2d 103 (2012), fn.7, citing *Southern Telecom v. Level 3 Communications*, 295 Ga.App. 268, 273, 671 S.E.2d 283 (2008).   Therefore, our review in this assignment of error will focus on whether the trial court erred in finding that the Plaintiffs' causes of action accrued more than one year prior to when they filed suit against BSI.

{¶ 33} Under Georgia law, " 'when the question is raised as to whether an action is barred by a statute of limitations, the true test to determine when the cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action

to a successful result.' " *Wallace v. Bock*, 279 Ga. 744, 747, 620 S.E.2d 820 (2005), quoting *U-Haul Co. of W. Ga. v. Abreu & Robeson, Inc.*, 247 Ga. 565, 566, 277 S.E.2d 497 (1981). On a contract claim, the statute of limitations begins to run at the time of its alleged breach. *Id.*, citing *Dolanson Co. v. C & S Natl. Bank*, 242 Ga. 681, 682, 251 S.E.2d 274 (1978). " 'The discovery rule is not applicable to a cause of action based on breach of contract; with respect to a breach of contract claim, the statute of limitation runs from the time the contract is broken rather than from the time the actual damage results or is ascertained.' " *Godwin* at 38, citing *Hamburger* at 385.

**{¶ 34}** Harborside and Sun were aware of the A.C.W. claim and the excess insurance policy with Safety National before Sun hired BSI to assist in its claims handling. Corvel, the administrator Harborside used before Sun hired BSI, sent updates to Safety National about A.C.W.'s claim. Consequently, at the time BSI was hired by Sun, both Safety National and Sun should have been aware that Safety National was the correct excess insurer for the A.C.W. claim. In early 2012, Safety National reached out to BSI after finding out that BSI had replaced Corvel as Sun's third-party administrator. Confusion then ensued within BSI, especially with Kelly Dickens, as to whether Safety National or AIG was responsible for excess insurance on the A.C.W. claim. Dickens sent at least three emails in 2012 that made it clear that (1) BSI did not know that Safety National was the correct insurer and (2) BSI was not proceeding forward as if Safety National was the correct insurer. Dickens copied Burnap of Sun on those emails. Burnap never corrected Dickens' mistaken belief as to the correct excess insurer. At a minimum, by 2012, Sun was on notice that BSI had breached its duties under the services

contract with Sun by dealing with the wrong insurer about the A.C.W. claim. Further, Sun should have been aware of the terms of the excess insurance policy with Safety National as part of its acquisition of Harborside. Sun knew that failure to timely report claims to Safety National would lead to a denial of a claim. A few years later in August and September 2018, there were internal emails within Genesis that made it clear that it was worried that a mistake had been made by BSI misidentifying AIG as the correct excess insurer for the A.C.W. claim. Employees of Genesis were worried that its claim for reimbursement to Safety National would be denied because of the late reporting of the claim and the failure to adequately respond to Safety National's previous requests for more information, including those contained in Safety Nationals' ROR letter. In short, Genesis knew of BSI's alleged breach of its services contract and the fact that damages had resulted therefrom more than one year before the Plaintiffs commenced their action against BSI. Therefore, the Plaintiffs did not commence their suit against BSI within the requisite one year provided for in the service contracts between the Plaintiffs and BSI.

{¶ 35} The trial court did not err in finding that the Plaintiffs failed to commence their action against BSI within one year of when their claims accrued. The first assignment of error is overruled.

III. The Trial Court Did Not Err in Concluding the Plaintiffs Could Not Recover Damages from BSI Related to Safety National's Denial of the Excess Claim

{¶ 36} The Plaintiffs' second and third assignments of error are interrelated and will be addressed together. These two assignments of error state:

THE TRIAL COURT ERRED IN ITS INTERPRETATION OF BROADSPIRE'S OBLIGATIONS UNDER § 2.1(d) OF THE SERVICES AGREEMENT TO "ASSIST" APPELLANTS IN REPORTING TO EXCESS CARRIERS BY IGNORING THE PLAIN MEANING OF "ASSIST," AS INFORMED BY THE COMMON LAW UNDERSTANDING OF THE DUTY OF AGENTS TO PROVIDE COMPLETE INFORMATION TO THEIR PRINCIPALS.

THE TRIAL COURT IMPROPERLY RESOLVED DISPUTED FACTUAL ISSUES IN GRANTING SUMMARY JUDGMENT ON APPELLANT'S CLAIMS THAT BROADSPIRE BREACHED SECTIONS 2.1(d) AND (e) OF THE SERVICES AGREEMENT.

{¶ 37} The trial court found that "[e]ven if Plaintiffs could prove any of [BSI's] actions or inactions were in breach of the Agreements, they cannot prove that the breaches caused the denial of the claim by [Safety National]." Summary Judgment Decision, p. 9. The trial court provided the following reasoning for its finding:

Plaintiffs have alleged that [BSI] breached the Agreements when it failed to report the claim to [Safety National] either when it appeared reasonably likely that the A.C.W. claim would exceed one year in duration, which would have been in 2008 or at the latest when the A.C.W. claim amount reached $250,000, 50% of the SIR, which occurred in 2010. The language of these sections of the Agreements is clear and unambiguous. [BSI] specifically disclaimed any liability in reporting claims to the excess

carrier. Therefore, [BSI] did not breach any of the Agreements by failing to report the claim to the excess carrier. That duty fell solely on Plaintiffs as also exhibited by the Policy. The Policy and the Agreements are clear that it was Harborside's/Sun's duty to report the claim to [Safety National]. Plaintiffs have not presented any evidence to prove otherwise.

* * *

Plaintiffs claim that [BSI] failed to assist them in reporting to [Safety National] by failing to respond to the RoR letter and subsequent inquiries from [Safety National] and by failing to notify Plaintiffs of the RoR and communications from [Safety National]. The Agreements are clear in that the duty to assist Plaintiffs was limited specifically to "provide loss runs, status reports, access to their claim system and adherence to claim specifications for reserve advisories and settlement consultation." Plaintiffs have not alleged or pointed to any evidence to show that [BSI] breached any of those duties. * * * Further, even if they had breached any of those obligations, the following sentence of Section 2.1(d) states that [BSI's] assistance is not a substitute for Plaintiff's contractual obligation to report claims to their excess carrier. Therefore, Plaintiffs are not able to show that such alleged breaches caused their damage, i.e. the refusal of the claim by [Safety National] because that duty fell solely on them.

Plaintiffs also allege that [BSI] failed to adequately maintain its claim file as required by Section 2.1(e) of the 2008 and 2010 agreements and

2.1(f) of the 2013 Agreement. There is a question of fact regarding [BSI's] maintenance of their claim file. The parties do not dispute that Plaintiffs had access to the claim file. Further, Plaintiffs admit that the claim notes reference [Safety National] at least three times as those notes came directly from CorVel's claim notes which they admit referenced both AIG and [Safety National]. There is a question of fact as to whether [BSI] received the RoR in 2012. There is also a question as to whether they updated the claim notes with all of the follow-up communication from [Safety National] after receiving the RoR. However, Plaintiffs have failed to present any evidence to show they were damaged as a result of that breach. Plaintiffs have not pointed to any evidence which would prove that had [BSI] maintained the claim file, seemingly updating it with the RoR and any communication received from [Safety National], that the claim would not have been denied.

*Id.* at 7-8.

**{¶ 38}** The Plaintiffs contend that the trial court erred in concluding "that [BSI's] obligations were limited to 'providing loss runs, status reports, access to our claim system and adherence to claim specifications for reserve advisories and settlement consultation' and that Appellants were expressly responsible to report claims to the excess carrier." Appellants' Brief, p. 18, citing Section 2.1(d) of the Service Agreement and Summary Judgment Decision, p. 8. According to the Plaintiffs, the trial court's narrow interpretation of the services contract with BSI ignored the fact that "[BSI's] role in assisting the client in reporting of excess carriers was principally one of providing information" and "[t]he facts

of this case exemplify the rationale for an agent's duty to share information."  *Id.* at 20.

{¶ 39} Further, the Plaintiffs argue that the trial court improperly resolved factual disputes in granting summary judgment to BSI.   First, the Plaintiffs contend that the trial court misconstrued Janice Burnap's testimony and "what steps she did or could have taken is a matter of credibility for the jury, not something that the trial court could resolve on summary judgment."  *Id.* at 21-22.   Second, the Plaintiffs believe that the trial court improperly ignored conflicting evidence on the issue of whether Safety National still would have denied the claim if BSI had responded to Safety National's requests before 2018. According to the Plaintiffs, "[c]ontrary to her testimony in litigation, Maggie Smith did not recommend immediate denial of coverage; rather, she indicated that [Safety National] would want a formal response to the ROR and indicated that she would undertake a detailed review of the file to determine if [Safety National] would accept coverage."  *Id.* at 23.   The Plaintiffs contend "[a]t a minimum, the contradiction between Ms. Smith's testimony in litigation and her actions, creates a credibility dispute, which, once again, should not be resolved on summary judgment."  *Id.* at 23-24.   "Further, [BSI's] own expert, Mr. Jolstad, testified that it is rare for excess carriers to deny coverage and that excess carriers frequently accept claims reported later than would have been the case if the ACW claim was reported in 2012."  *Id.* at 24, citing Deposition of O. Jolstad, p. 122-124.

{¶ 40} The construction, interpretation, and legal effect of a contract is an issue of law, which is subject to de novo review.  *Natl. Hills Exchange, LLC v. Thompson*, 319 Ga.App. 777, 778, 736 S.E.2d 480 (2013).   " 'The normal rules of contract construction

apply, and absent ambiguity that cannot be resolved by applying the rules of contract construction, the contract remains a question of law.' "  *Id.*, quoting *Huckaby v. Cheatham*, 272 Ga.App. 746, 749-750, 612 S.E.2d 810 (2005).

**{¶ 41}** "Under Georgia law, a contract is unambiguous when it is capable of only one reasonable interpretation, and, if there is no ambiguity, the contract is enforced according to its plain terms."  *In re Estate of Boyd*, 340 Ga.App. 744, 747, 798 S.E.2d 330 (2017), citing *Freund v. Warren*, 320 Ga.App. 765, 768-69, 740 S.E.2d 727 (2013). "When determining the meaning of the words used in a contract, the words will 'generally bear their usual and common meaning and the usual and common meaning of a word may be supplied by common dictionaries.' "  *Id.*, citing *Global Ship Sys., LLC v. Continental Cas. Co.*, 292 Ga.App. 214, 216, 663 S.E.2d 826 (2008).

**{¶ 42}** Section 2.1(d) of Exhibit 1 of the first services contract in the record between Sun and BSI stated "[BSI] shall not be responsible for reporting to or placing any specific excess insurer(s) on notice of any Claim(s) that is/are or may be required to be reported or noticed to Client's excess insurer(s)."  Section 2.1(d) of Exhibit 1 of the 2010 and 2013 service contracts governing the relationship between the Plaintiffs and BSI are identical to each other and state:

> [BSI] agrees to assist Client with reporting to its excess carrier(s) by providing loss runs, status reports, access to our claim system and adherence to claim specifications for reserve advisories and settlement consultation.  [BSI's] reporting is to assist Client with meeting its excess reporting obligations and therefore does not substitute nor eliminate Client's

contractual obligation to report claims to the excess carrier(s). As excess claim reporting is Client's contractual obligation, [BSI] will not assume any liability for this reporting obligation.

**{¶ 43}** The plain language of the contracts between the Plaintiffs and BSI recognizes that the Plaintiffs had the contractual obligation to report claims to the excess carrier and that BSI would not assume *any* liability for the Plaintiffs' reporting obligation to the excess insurance carrier.

**{¶ 44}** Indeed, the insurance policy between the Plaintiffs and Safety National made it clear that the Plaintiffs were the responsible party for providing prompt notice to Safety National. For example, Section I of the Policy titled "Prompt Reporting of Claims" provided, in part:

As soon as the EMPLOYER becomes aware, the EMPLOYER must provide prompt notice to the CORPORATION of: (a) any claim or action commenced against the EMPLOYER which exceeds, or is likely to exceed, fifty percent (50%) of the Self-Insured Retention Per Occurrence specified in Item 7 of the Declarations; * * * (c) any disability claim whether or not contested by the EMPLOYER, where it appears reasonably likely that such disability will exceed one year in duration, or where such disability actually exceeds one year in duration.

* * *

Failure to render prompt notice of any claim in a manner sufficient to the CORPORATION by the EMPLOYER, or its designated

representative(s), may result in the disclaimer of coverage for the particular claim. To constitute prompt, sufficient notice, the EMPLOYER must provide complete information as to the details of the injury, disease, or death.

{¶ 45} The contract between Safety National and the Plaintiffs imposes additional duties on the Plaintiffs. For example, Section J of the Policy discussed the importance of attempting to settle workers' compensation claims and keeping Safety National informed so that it could investigate and participate in defending against the workers' compensation claims. That Section provided:

> The EMPLOYER shall investigate and settle or defend all claims and shall conduct the defense and appeal of all actions, suits, and proceedings commenced against it. The EMPLOYER shall forward promptly to the CORPORATION copies of any pleadings or reports as may be requested. The CORPORATION shall not be obligated to assume charge of the investigation, defense, appeal or settlement of any claim, suit, or proceeding brought against the EMPLOYER, but the CORPORATION shall be given the opportunity to investigate, defend, or participate with the EMPLOYER in the investigation and defense of any claim, if, in the opinion of the CORPORATION, its liability under this Agreement might be involved.

{¶ 46} Section K of the Policy further provided:

> The EMPLOYER shall use diligence, prudence, and good faith in the investigation, defense, and settlement of all such claims and shall not

unreasonable refuse to settle any claim which, in the exercise of sound judgment with respect to the entire claim, should be settled, provided, however, that the EMPLOYER shall not make any payment or agree to any settlement for any sum which would involve the limits of the CORPORATION's liability hereunder without the approval of the CORPORATION. The EMPLOYER's failure to exercise diligence, prudence, and goof faith may result in the disclaimer of coverage for the particular claim.

{¶ 47} The ROR letter from Maggie Smith at Safety National to Hardie at BSI cited all these contractual provisions between Safety National and the Plaintiffs. Smith testified at her deposition that Safety National likely would have denied coverage on the claim even if BSI or the Plaintiffs had done a better job going forward of providing the information requested in her ROR letter. This is because at the time the ROR letter was sent, the Plaintiffs had already breached their contractual obligations with Safety National by failing to timely report the A.C.W. claim.

{¶ 48} The record before us is replete with evidence of confusion internally at BSI about who was the proper excess insurance carrier for the A.C.W. claim. Mistakes were made in real-time that caused the wrong insurer to be identified for several years. And BSI was not the only one who made mistakes. BSI was under the impression that AIG was the correct excess insurance carrier. This made some sense given that AIG was Sun's excess insurance carrier during the time when A.C.W. was injured and filed her claim. But, apparently, Sun's acquisition of Harborside did not affect the fact that Safety

National, rather than AIG, was financially responsible as the excess insurer for the A.C.W. claim.

{¶ 49} AIG did not help in alleviating the confusion. Indeed, for several years, AIG gave BSI and Genesis the impression that it would accept responsibility for the A.C.W. claim once the claims amount exceeded the $1,000,000 SIR contained in the AIG insurance policy. BSI made some attempts to clear up the confusion by carbon copying Janice Burnap of Sun (and later, Genesis) on some emails about who was the proper excess insurance carrier regarding the A.C.W. claim. Burnap testified that she did not respond to or pay attention to the emails because she was only copied on them. Interestingly, she testified that if she had been contacted directly about the matter, she would have checked her records and confirmed that Safety National was the correct excess insurance carrier for the A.C.W. claim. This highlights the fact that BSI ultimately had to rely on the information it received from its client (i.e., the Plaintiffs) when it came to determining who the proper excess carrier was.

{¶ 50} Safety National did not handle things well either. Safety National was most aware throughout this claims saga of its responsibility to pay on the A.C.W. claim as the correct excess insurance carrier. While it contacted BSI in 2012 to request some information on the status of A.C.W.'s claim, it is odd that Safety National would not directly contact its actual insured, the Plaintiffs, when it was not getting the answers or information it wanted from BSI, a company with whom Safety National had no contractual relationship, or from Corvel, the previous third-party administrator. While it may be typical within the excess insurance industry to deal on a daily basis with the third-party administrator rather

than the insured when seeking information about a claim, the current situation ceased being a typical situation once Safety National did not receive an immediate response to its ROR letter or its repeated requests for additional information, especially when the denial of coverage for such a significant claim may be devastating to a self-insured employer. Further, multiple witnesses testified that it was not typical in the industry for an insurer to not send a copy of an ROR letter directly to its insured. The employees of Safety National were unable to provide a good explanation for their decision not to send a copy directly to the insured (i.e., the Plaintiffs) other than citing an internal practice at Safety National.

{¶ 51} In short, there is plenty of blame to go around regarding who helped create this excess insurance morass. And there are plenty of factual disputes as to who knew exactly what when and what should have been known when. But the existence of the disclaimer of liability in the contract between BSI and the Plaintiffs made those factual issues immaterial to the Plaintiffs' claims against BSI. All the damages sought in the Plaintiffs' complaint ultimately flowed from Safety National's denial of coverage, which was due to the failure to timely report the excess insurance claim to Safety National. As such, the contractual disclaimer that BSI would not assume any liability for the Plaintiffs' reporting obligation required this dispute to be resolved in BSI's favor as a matter of law.

{¶ 52} The trial court did not err in granting summary judgment to BSI on the breach of contract claim. The second and third assignments of error are overruled.

IV. The Trial Court Properly Dismissed the Plaintiffs' Remaining Claims that were

Contingent on Sun's Success on Its Breach of Contract Claim Against BSI

**{¶ 53}** The Plaintiffs' fourth assignment of error states:

THE TRIAL COURT ERRED IN DISMISSING THE THIRD-PARTY BENEFICIARY BREACH OF CONTRACT CLAIMS OF GENESIS AND HARBORSIDE AND APPELLANTS' CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING ON THE SAME GROUNDS.

**{¶ 54}** The trial court stated that under Georgia law there "is no independent cause of action for violation of a duty of good faith and fair dealing in the performance of a contract apart from breach of an express term of the contract." Summary Judgment Decision, p. 10. Therefore, the trial granted summary judgment to BSI on the breach of good faith and fair dealing claim based on its finding that BSI was entitled to summary judgment on the breach of contract claims.

**{¶ 55}** According to the Plaintiffs, the trial court's grant of summary judgment on their claim for breach of the covenant of good faith and fair dealing and the third-party beneficiary breach of contract claims should be reversed, because it was based on the flawed finding that BSI was entitled to summary judgment on the breach of contract claim. The Plaintiffs contend that "[a]lthough there is no 'independent' claim for breach of covenant of good dealing under Georgia law, genuine issues of material fact regarding the underlying breach of contract claim preclude dismissal of the good faith and fair dealing claim on summary judgment as well." Appellants' Brief, p. 24, citing *Layer v. Clipper Petroleum, Inc.,* 319 Ga.App. 410, 735 S.E.2d 65, 74 (2012). Further, the

Plaintiffs note that BSI did not dispute that Genesis and Harborside were third-party beneficiaries to the service contract between BSI and Sun.

**{¶ 56}** As the trial court correctly explained, "[t]here is no independent cause of action for violation of a duty of good faith and fair dealing in the performance of a contract 'apart from breach of an express term of the contract.' " *Bankston v. RES-GA Twelve, LLC,* 334 Ga.App. 302, 304, 779 S.E.2d 80 (2015), quoting *Morrell v. Wellstar Health Sys., Inc.*, 280 Ga.App. 1, 5, 633 S.E.2d 68 (2006). As discussed above in our resolution of the second and third assignments of error, the trial court did not err in granting summary judgment to BSI on Sun's breach of contract claim. Consequently, the claim for breach of the duty of good faith and fair dealing under the contract was also properly dismissed, since there is no such independent cause of action apart from the breach of contract claim.

**{¶ 57}** The fourth assignment of error is overruled.

V. Conclusion

**{¶ 58}** Having overruled all of Plaintiffs'-Appellants' assignments of errors, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

EPLEY, J. and HUFFMAN, J., concur.